IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JV GROUP, INC., a California corporation,

                Plaintiff,

        v.

CH CAPITAL PARTNERS, LLC, an Oregon
limited liability company; SOK CORDELL, an
individual; and GEORGE SWIFT, an
individual,

                Defendants.

Case No. 3:25-cv-01591-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

      Plaintiff JV Group, Inc. ("Plaintiff") filed this diversity action against Defendants CH

Capital Partners, Inc. ("CHC"), Sok Cordell ("Cordell"), and George Swift ("Swift") (together,

"Defendants"), asserting claims for fraudulent inducement, negligent misrepresentation, breach

of contract, breach of an implied contract, breach of a third-party beneficiary contract, breach of

the implied covenant of good faith and fair dealing, quantum meruit, unjust enrichment, and

declaratory relief.

      Swift now moves under Federal Rule of Civil Procedure ("Rule") 12(b)(3) to dismiss for

improper venue, and Defendants jointly move under Rule 12(b)(6) to dismiss Plaintiff's

PAGE 1 – OPINION AND ORDER

complaint for failure to state a claim upon which relief can be granted. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). For the reasons explained below, the Court denies Swift's motion to dismiss for improper venue and denies Defendants' motions to dismiss for failure to state a claim.

## BACKGROUND[1]

Plaintiff is a California corporation and real estate services business that maintains its principal place of business in Irvine, California. (Compl. ¶¶ 1, 3, 10, ECF No. 1.) Plaintiff's business involves marketing and using its "substantial contacts and connections" to "represent[] sellers and buyers in the hotel industry throughout the United States[.]" (Id. ¶¶ 10, 13-14, 16, 29.)

CHC is an Oregon limited liability company that maintains its principal place of business in Beaverton, Oregon. (Id. ¶¶ 1, 4.) Cordell is an Oregon resident and CHC's sole member, owner, and managing director.[2] (Id. ¶¶ 1, 5.) Swift is a Washington resident who, during the relevant period, owned and intended to sell twelve hotel properties (the "Hotel Properties") that were located in different parts of the Pacific Northwest and worth at least $100 million. (Id. ¶¶ 1, 6, 18, 22.)

---

[1] For purposes of this background section and the Court's evaluation of Defendants' Rule 12(b)(6) motions, the Court draws the facts from Plaintiff's complaint's well-pleaded factual allegations and an exhibit that Plaintiff attached thereto. *See Parents for Priv. v. Barr*, 949 F.3d 1210, 1218 n.2 (9th Cir. 2020) (reviewing a dismissal for failure to state a claim and "draw[ing] the facts from the complaint's well-pleaded factual allegations and from the exhibits attached to the complaint") (citation omitted); *Hickox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1059 (9th Cir. 2017) (evaluating a dismissal "at the pleading stage under Rule 12(b)(6) for failure to state a claim" and thus "treat[ing] the facts as pleaded in the complaint and attached exhibits as true").

[2] Throughout this opinion, the Court refers to CHC and Cordell together as the "CHC Defendants."

In March 2023, Cordell solicited Plaintiff's general counsel's assistance in selling Swift's Hotel Properties. (*Id.* ¶ 11.) Cordell informed Plaintiff's general counsel that (1) Cordell and Cordell's company, CHC, entered into an "Exclusive Licensing Agreement" with Swift, (2) under the Exclusive Licensing Agreement, Cordell and CHC were entitled to a three percent commission on the sale of Swift's Hotel Properties, (3) "Cordell/CHC needed assistance" "finding a buyer," and (4) if Plaintiff assisted "Cordell/CHC by generating a lead that resulted in the actual purchase, lease, sale, or exchange of the Hotel Properties, then Cordell/CHC would split the [three percent] commission . . . with Plaintiff [fifty-fifty], i.e., [one-and-a-half percent] each." (*Id.*)

Relying on Cordell's "representations and promises," Plaintiff agreed to assist in selling Swift's Hotel Property and entered into a "Commission Sharing Agreement" with CHC on March 21, 2023. (*Id.* ¶ 12 & Ex. 1 at 1.) The Commission Sharing Agreement, reflecting an effective date of March 20, 2023, and that Cordell signed on CHC's behalf and in his capacity as CHC's managing director, identifies Plaintiff as the "Buying Broker" and CHC as the "Selling Broker" with a "current exclusive listing agreement . . . for twelve . . . individual hotel properties located in the Pacific Northwest referred to as the Anchorage Hotel and Ledgestone Hotel[.]" (*Id.* Ex. 1 at 1.)

The Commission Sharing Agreement provides that subject to its terms and conditions, CHC agreed to pay Plaintiff a "[c]ooperating [b]rokerage [f]ee" equal to one-and-a-half percent of the "transaction amount" or fifty percent of CHC's "entire real estate commission" of three percent. (*Id.*) The Commission Sharing Agreement conditions CHC's payment to Plaintiff on the following: (1) the hotel properties' owner "must have entered into a binding agreement with a lead generated by the Buying Broker for the purchase, lease, sale or exchange (collectively

'acquisition') of the [p]roperty," (2) "[t]he acquisition transaction . . . must have closed," and (3) "[t]he Selling Broker must have received from the escrow/closing office all of the real estate commission owed to the Selling Broker under the terms of the [Exclusive] Listing Agreement." (*Id.*)

Over the ensuing fourteen months, Plaintiff, acting primarily through its general counsel, devoted considerable time and resources marketing Swift's Hotel Properties and attempting to locate a buyer on Defendants' behalf. (*Id.* ¶ 13.) For example, Plaintiff's efforts included, but were not limited to, "communicating extensively with Cordell/CHC," meeting directly, both in person and virtually, with Swift, having Plaintiff's general counsel meet and communicate directly with Swift, "visiting," "arranging for photos," and "preparing marketing materials for [Swift's] Hotel Properties," and "canvas[s]ing Plaintiff's many contacts and connections for interest in [Swift's] Hotel Properties." (*Id.* ¶¶ 13-14.) Plaintiff's efforts also included introducing and "presenting potentially interested buyers to both Swift and Cordell/CHC," "obtaining financial documents concerning [Swift's] Hotel Properties from Swift," providing financial documents to "potentially interested buyers," and "cooperating with Swift's requests to obtain non-disclosure agreements from potentially interested buyers in order to receive such financial documents." (*Id.* ¶ 13.)

Plaintiff identified and introduced multiple leads (and potential buyers) to Swift and Cordell/CHC, including JL Properties, Inc. ("JL Properties"). (*Id.* ¶ 18.) On May 17, 2024, JL Properties submitted and asked Plaintiff to convey to Defendants a signed written "Letter of Intent" to purchase all twelve of Swift's Hotel Properties for a combined purchase price of $108 million. (*Id.*) The Letter of Intent addressed "[c]ommissions" and identified JL Properties as a

self-represented buyer and Plaintiff as the seller's "[b]roker" and "exclusive[] represent[ative]." (*Id.*)

Plaintiff promptly provided Defendants with JL Properties' Letter of Intent and Plaintiff's general counsel informed Swift that he was willing to serve as a "second set of eyes on the purchase and sale documents for [him] and . . . assist[] in documenting and closing the deal with JL Properties." (*Id.* ¶ 19.) Swift declined and responded that he would "take it from here, brother." (*Id.*)

After engaging in additional direct negotiations with Swift, JL Properties agreed to (and ultimately did) purchase eight of Swift's twelve Hotel Properties for a combined purchase price of $89 million. (*Id.* ¶ 20.) JL Properties and Swift's transaction closed the week of March 3, 2025. (*Id.*)

Given the eight Swift Hotel Properties' purchase price of $89 million and Plaintiff's introduction of JL Properties, Plaintiff was entitled to half of the three percent commission that Swift owed to CHC at the time of closing (i.e., half of $2.67 million or $1.335 million). (*See id.* ¶¶ 12, 14-16, 21-22 & Ex. 1 at 1, demonstrating that Plaintiff relies on the terms of the Commission Sharing Agreement and theories that Cordell/CHC's Exclusive Listing Agreement with Swift conferred upon Plaintiff enforceable rights as a third-party beneficiary and Plaintiff's general counsel's meetings and/or direct communications with Swift created an implied-in-fact contract).

The parties discussed Plaintiff's commission several times after the sale. (*Id.* ¶ 23.) For example, on March 11, 2025, Cordell responded to Plaintiff's inquiry regarding its commission payment by stating that he had spoken to Swift and that Swift planned to "issu[e] the checks next week." (*Id.*) On March 26, 2025, Cordell once again assured Plaintiff that he had spoken to Swift

earlier that same day and that they "expect[ed] to have [the] final document approval shortly," believed that they would be in "a position to settle this week or next," previously "coordinated with [their] private bankers to ensure that wire[ transfers would not] trigger any threshold hold issues," and "[e]verything [was] in motion." (*Id.*) On April 30, 2025, after Plaintiff requested "numerous redlined revisions" to Cordell/CHC's "subsequent unilateral request that Plaintiff sign a release of Swift," which Plaintiff was "not comfortable with and [found] concerning," Cordell/CHC responded, "I want to clarify that I'm representing George [Swift] in this matter, and I do not have authority to sign anything that hasn't been reviewed and approved by him." (*Id.*)

Plaintiff also learned that on May 22, 2025, Swift "made statements confirming that [he] had a contract with Cordell to pay commissions" and the "money [was] sitting in an account," but Cordell told Swift "not to pay any of the commission money over to Cordell because Cordell was 'trying to figure out a deal with Plaintiff.'" (*Id.* ¶ 24.) Further, Plaintiff learned that during Swift's direct negotiations with JL Properties, "Swift secretly removed Plaintiff's name from the purchase and sale agreement referencing Plaintiff as broker for the sale, and . . . inserted [his] own name [and] . . . purport[ed] [to] represent[] himself in the transaction without a broker." (*Id.* ¶¶ 24, 27.)

Despite "multiple demands," Defendants have failed to pay Plaintiff its one-and-a-half percent commission stemming from JL Properties' purchase of eight of Swift's Hotel Properties. (*Id.* ¶¶ 22, 28.) Instead, Defendants "withheld payment from Swift to Cordell/CHC in an account [that Swift] controlled[,] . . . so as to create a pretense that no commission had yet been paid to Cordell/CHC in order to try and exert . . . leverage on Plaintiff to settle for a much lower commission than [the parties previously] agreed." (*Id.*) Defendants have also refused to "disclose

any information" as to whether Plaintiff's "many leads" resulted in the "purchase, lease, sale, or exchange" of Swift's four remaining Hotel Properties and entitlement to further commissions. (*Id.* ¶ 29.)

Based on these events, Plaintiff filed this diversity action against Defendants on September 5, 2025. (*Id.* at 21; Civ. Cover Sheet at 1, ECF No. 1-2.) In response, Defendants filed their motions to dismiss for improper venue and failure to state a claim. (Defs. CHC & Cordell's Notice & Mot. Dismiss Pl.'s Compl. ("CHC Defs.' Mot.") at 1-4, ECF No. 7; Defs. CHC & Cordell's Mem. Points & Auths. Supp. Mot. Dismiss Pl.'s Compl. ("CHC Defs.' Mem. Supp.") at 1-15, ECF No. 7-1; Def. Swift's Mot. Dismiss & Mem. Supp. ("Swift's Mot.") at 1-17, ECF No. 16.)

On February 13, 2026, the Court held oral argument and took Defendants' motions under advisement.

## LEGAL STANDARDS

## I.    IMPROPER VENUE

Rule 12(b) identifies seven defenses that "a party may assert . . . by motion," including "improper venue." FED. R. CIV. P. 12(b)(3). "When resolving a motion under [Rule 12(b)(3)], courts 'draw all reasonable inferences . . . and resolve all factual conflicts in favor of the non-moving party[,]' . . . [but] need not accept the pleadings as true and may consider facts outside the pleadings."[3] *Estes v. Metrc, Inc.*, No. 3:25-cv-00556-IM, 2025 WL 1638206, at *1 (D. Or.

---

[3] A leading treatise describes "[p]ractice on a motion under Rule 12(b)(3) as relatively straightforward," noting that in "most jurisdictions (except, most notably, in the Ninth Circuit), all well-pleaded allegations in the complaint bearing on the venue question generally are taken as true, unless contradicted by the defendant's affidavits." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 & n.21 (4th ed. Sept. 2025 update) (simplified) (first citing *Petersen v. Boeing Co.*, 715 F.3d 276, 279 (9th Cir. 2013); then citing *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009); then citing *Color Switch LLC v. Fortafy Games DMCC*, 377 F. Supp. 3d 1075, 1082 (E.D. Cal. 2019), *aff'd*, 818 F. App'x 694, 695-97 (9th Cir.

June 9, 2025) (first quoting *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004); and then citing *Doe 1*, 552 F.3d at 1081); *City Antiques, Inc. v. Planned Furniture Promotions, Inc.*, No. 3:14-cv-00467-SI, 2014 WL 3955216, at *1 (D. Or. Aug. 12, 2014) (same); *see also Richards v. Lloyd's of London*, 135 F.3d 1289, 1292 (9th Cir. 1998) (en banc) (observing at the outset that because the Ninth Circuit was "reviewing a Rule 12(b)(3) motion decision, [it] need not accept the pleadings as true" (citing *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996))).

## II.    FAILURE TO STATE A CLAIM

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Thus, "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

///

///

---

2020); and then citing *Charter Oak Fire Ins. Co. v. Interstate Mech., Inc.*, No. 3:10-cv-01505-PK, 2012 WL 1357674, at *6 (D. Or. Mar. 29, 2012), *findings and recommendation adopted*, 2012 WL 1357652, at *1 (D. Or. Apr. 19, 2012)).

## DISCUSSION

Pursuant to Rules 12(b)(3) and 12(b)(6), Swift moves to dismiss for improper venue and

Defendants move to dismiss Plaintiff's complaint, with prejudice and without leave to amend,

for failure to state a claim upon which relief can be granted.[4] (CHC Defs.' Mot. at 1; Swift's

Mot. at 2.)

## I.    IMPROPER VENUE

### A.    Applicable Law

A district court may only dismiss an action under Rule 12(b)(3) when venue is "wrong"

or "improper," which "depends exclusively on whether the court in which the case was brought

satisfies the requirements of federal venue laws[.]" *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for*

*W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). Typically, the general federal venue statute, 28 U.S.C.

§ 1391, governs a district court's determination of whether venue is "wrong" or "improper."[5] *Id.*;

*see also Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th 1131, 1140 (9th Cir. 2022) ("The

---

[4] Defendants filed requests for judicial notice, declarations, and exhibits in support of their motions. (*See* Defs. CHC & Cordell's Req. Judicial Notice ("CHC Defs.' RJN") ¶¶ 1-6 & Exs. 1-6, ECF No. 7-2; Def. Swift's Req. Judicial Notice ("Swift's RJN") ¶¶ 1-2 & Exs. 1-2, ECF No. 16-2; Decl. George Swift Supp. Mot. Dismiss ("Swift Decl.") ¶¶ 1-4, ECF No. 16-1; Decl. George Swift Supp. Reply Pl.'s Opp'n Mot. Dismiss ("Swift Reply Decl.") ¶¶ 1-5, ECF No. 21-1.) Plaintiff also filed a declaration in support of its opposition to Swift's motion. (*See* Decl. Kevin Muldoon Supp. Pl.'s Opp'n Def. Swift's Mot. Dismiss ("Muldoon Decl.") ¶¶ 1-22, ECF No. 20.)

[5] "Congress has sometimes enacted specialized venue statutes governing particular classes of cases." *Tobien v. Nationwide Gen. Ins. Co.*, 133 F.4th 613, 618 n.1 (6th Cir. 2025) (citing, by way of example, 28 U.S.C. § 1400(b) (patents and copyrights, mask works, and designs)), *cert. denied*, No. 25-439, --- S. Ct. ----, 2026 WL 135652, at *1 (U.S. Jan. 20, 2026). As Swift and Plaintiff agree (*see* Swift's Mot. at 4-9; Pl.'s Opp'n Def. Swift's Mot. Dismiss ("Pl.'s Opp'n Swift's Mot.") at 7-12, ECF No. 19; & Def. Swift's Reply Supp. Mot. Dismiss ("Swift's Reply") at 2-5, ECF No. 21, focusing only on the general federal venue statute), because this case is not "encompassed by any special venue statute[,] . . . venue is only proper in a district that meets at least one criterion set forth in [Section] 1391." *Tobien*, 133 F.4th at 618 n.1.

general federal venue statute . . . 'govern[s] the venue of all civil actions brought in district courts of the United States[,] . . . [e]xcept as otherwise provided by law.'" (quoting 28 U.S.C. § 1391(a))).

Section 1391(b) identifies three "categories" of judicial districts in which venue is proper and plaintiffs may file civil lawsuits. *See Tobien*, 133 F.4th at 618 ("[Section 1391(b)] lets plaintiffs sue in three main places[.]"); 28 U.S.C. § 1391(b)(1)-(3) (listing "judicial district[s]" in which "[a] civil action may be brought"); *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 408 (2017) ("Congress generally uses the expression, where suit 'may be brought,' to indicate the federal districts in which venue is proper." (simplified) (quoting 28 U.S.C. § 1391(b)); *Atl. Marine*, 571 U.S. at 55-56 & n.3 (addressing these "categories" and noting that "[o]ther provisions of [Section] 1391 define the requirements for proper venue in particular circumstances"). Specifically, Section 1391(b) provides that a "civil action may be brought" in these districts:

> (1)    a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2)    a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3)    if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)-(3).

Section 1391(b)(1) and (b)(2) "define the preferred judicial districts for venue in a typical case," whereas Section 1391(b)(3) provides a "fallback option," which "ensures that so long as a federal court has personal jurisdiction over the defendant, venue will always lie somewhere." *Atl. Marine*, 571 U.S. at 56-57. Where, as here, a party challenges venue by moving to dismiss under Rule 12(b)(3), a district court "must determine whether the case falls within one of the three

categories set out in [Section] 1391(b)." *Id.* at 56. If the district court finds that the case "does

not [do so], venue is improper, and the case must be dismissed or transferred under [Section]

1406(a)."[6] *Id.*

### B.    Analysis

Swift moves to dismiss under Rule 12(b)(3), arguing that venue is improper in this

district. (Swift's Mot. at 2, 6-8.) As explained below, the Court disagrees and finds that venue is

proper.

Plaintiff bears the burden of demonstrating that venue is proper in the District of Oregon.

*See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979) (stating

that the "[p]laintiff had the burden of showing that venue was properly laid in the Northern

District of California"); *cf. Bryce v. Choice Hotels Int'l, Inc.*, 781 F. App'x 649, 649 (9th Cir.

2019) ("The district court properly dismissed [the self-represented plaintiff's] action because

[she] failed to establish that any defendant resides in the District of Oregon or that a substantial

part of the events or omissions giving rise to her claims occurred there." (citing 28 U.S.C.

§ 1391(b)(1)-(2))); *see also Tobien*, 133 F.4th at 619 ("[W]hen a defendant challenges the venue,

the plaintiff bears the burden of proving venue by a preponderance of the evidence."). Plaintiff

has met its burden here.

In challenging venue, Swift addresses each of Section 1391(b)'s categories. (*See* Swift's

Mot. at 6-8.) Plaintiff does not dispute Swift's assertion that it lacks the ability to satisfy Section

---

[6] Section 1406 provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought" and that "[n]othing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue." 28 U.S.C. § 1406(a)-(b).

1391(b)(1) because Defendants are not all residents of Oregon. (*See id.* at 6, presenting this argument regarding Section 1391(b)(1); Pl.'s Opp'n Swift's Mot. at 7, acknowledging that "Swift is a resident of Washington"; Compl. ¶¶ 1, 6, alleging that Swift was "residing and domiciled" at all relevant times in Washington). Nor does Plaintiff dispute Swift's assertion that Section 1391(b)(3)'s fallback option is "inapplicable" because there is at least one judicial district in which venue is proper under Section 1391(b)(2).[7] (*See* Swift's Mot. at 8, citing Swift's initial declaration and implying that the District of Alaska provides a "more appropriate venue" under Section 1391(b)(2), because that is where the Hotel Properties that JL Properties purchased are located; Pl.'s Opp'n Swift's Mot. at 7-12, declining to reach this argument regarding Section 1391(b)(3)).

Relatedly, and with respect to Section 1391(b)(2), Plaintiff suggests that the location of Swift's Hotel Properties is not determinative because Section 1391(b)(2) also provides that venue is "proper where a substantial part of the events or omissions giving rise to the claim occurred." (Pl.'s Opp'n Swift's Mot. at 7) (simplified). The Court agrees. The Ninth Circuit so held in *Cox v. Gritman Medical Center*, No. 24-1947, --- F.4th ----, 2026 WL 378500, at *11 (9th Cir. Feb. 11, 2026):

> Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). . . . [T]he record establishes that a substantial part of the events giving rise to [the] [p]laintiffs' claims occurred in the Eastern District of Washington and that venue therein is proper.

---

[7] The Court notes that Section 1391(b)(2) "may be the basis for venue in multiple districts," Charles Alan Wright et al., *supra* note 3, § 3806, and that Section 1391(b)(3)'s availability is conditioned on there being "no district in which an action may otherwise be brought as provided in [Section 1391.]" 28 U.S.C. § 1391(b)(3); *see also Tobien*, 133 F.4th at 619 (explaining that Section 1391(b)(3)'s "fallback rule" comes into play when "venue isn't available under [Section] 1391(b)(1) or (b)(2)").

*Id.*; *see also* 28 U.S.C. § 1391(b)(2) (providing that "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, *or* a substantial part of property that is the subject of the action is situated") (emphasis added).

Consistent with these facts and observations, the Court's resolution of Swift's Rule 12(b)(3) motion turns on whether Plaintiff has carried its burden of demonstrating that a substantial part of the events or omissions giving rise to its claims occurred in the District of Oregon. (*See* Pl.'s Opp'n Swift's Mot. at 8-12 & Swift's Reply at 2-5, focusing on the same issue). In resolving this matter, the Court "need not accept the pleadings as true" and may (and does) "consider facts outside the pleadings," *Estes*, 2025 WL 1638206, at *1 (citing *Doe 1*, 552 F.3d at 1081); *City Antiques*, 2014 WL 3955216, at *3 (same)—namely, the declarations and exhibits that Plaintiff and Swift filed in support of their positions. (*See* Muldoon Decl. ¶¶ 1-22; Swift Reply Decl. ¶¶ 1-5 *see also* Swift Decl. ¶¶ 1-4, addressing only the eight properties' locations).

Importantly, however, when considering facts outside the pleadings in resolving motions under Rule 12(b)(3), courts must still "draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Estes*, 2025 WL 1638206, at *1 (quoting *Murphy*, 362 F.3d at 1138); *City Antiques*, 2014 WL 3955216, at *1 (same). Doing so here supports that the Court's conclusion that a "substantial part of the events giving rise" to Plaintiff's claims occurred in the District of Oregon and that venue is proper under Section 1391(b)(2).

In tort cases, courts evaluating venue "focus on where the allegedly tortious actions took place and where the noneconomic harms were felt." *Cox*, 2026 WL 378500, at *11 (noting as

much in a case in which a surviving husband's wife "died of a fatal overdose of medications" "near [their] home" and the husband sued the wife's Idaho-based physician and clinic in the nearby Washington district in which they lived, and that "[t]he 'locus of the injury' is sufficient to establish proper venue" (first quoting Charles Alan Wright et al., *supra* note 7, § 3806; and then quoting *Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1076 (9th Cir. 2001))). By comparison, in contract cases, courts focus on the location of negotiations, execution, performance, and the alleged breach:

> Many courts have applied the transactional venue provision in contract cases. In the margin are cases in which the courts concluded that a substantial part of the events or omissions giving rise to the plaintiff's contract claim did occur or did not occur in the forum district. A review of the cases demonstrates that the courts tend to focus on where the contract was negotiated or executed, where the contract was to be performed, and where the contract was allegedly breached. In the electronic age—where letters, faxes, and telephone calls are augmented by e-mails, instant messages, and tweets—it is increasingly likely that negotiation and execution of contracts take place in disparate locations. This fact leads inevitably to increasing arguments about where a "substantial" part of a claim arose in contract case.

Charles Alan Wright et al., *supra* note 7, § 3806 (simplified).

Plaintiff asserts both tort and contract claims in this lawsuit. Specifically, Plaintiff asserts claims against Defendants for fraudulent inducement, negligent misrepresentation, breach of contract, breach of an implied contract, breach of a third-party beneficiary contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, unjust enrichment, and declaratory relief. (*See* Compl. at 11, 13-19, naming the CHC Defendants and Swift under Plaintiff's third and fourth causes of action for breach of contract and breach of an implied contract, respectively).

All of Plaintiff's claims concern each party to this litigation. Plaintiff is a California-based "real estate services business" that "represents sellers and buyers in the hotel industry throughout the United States and has substantial contacts and connections therein." (Compl. ¶¶ 1,

3, 10; *see also* Muldoon Decl. ¶¶ 1-22, demonstrating that Plaintiff's general counsel, Kevin

Muldoon ("Muldoon"), attests to, and supplements in certain limited respects, most of the factual

allegations in Plaintiff's complaint). CHC is an Oregon limited liability company that maintains

its principal place of business in Beaverton, Oregon, and Cordell is an Oregon resident and

CHC's owner, sole member, managing director, and purported "alter ego." (Compl. ¶¶ 1, 4-5;

Muldoon Decl. ¶ 4.) Finally, Swift is a Washington resident who owned twelve Hotel Properties

that were worth in excess of $100 million (including eight that sold for $89 million), "located in

different parts of the Pacific Northwest," and known as the "Anchorage Hotel and Ledgestone

Hotel." (Compl. ¶¶ 1, 6, 18, 20, 22 & Ex. 1 at 1; Swift Decl. ¶¶ 3-4; Muldoon Decl. ¶¶ 5, 7-8, 15,

17.)

       Further, all of Plaintiff's claims arise from its principal legal theory. Plaintiff's principal

legal theory is that because Oregon-based CHC Defendants "needed assistance . . . finding a

buyer" for Swift's twelve Hotel Properties and knew about Plaintiff's "substantial contacts and

connections" in the "hotel industry throughout the United States," the CHC Defendants, acting

with Swift's "knowledge and approval," (1) "approached" and "solicit[ed]" Plaintiff's general

counsel's "help in selling" Swift's Hotel Properties, (2) "coerce[d]" and "induce[d]" Plaintiff into

expending, and continuing to expend, "all of its substantial time and effort to locate and

introduce a lead who would, and did, develop into an actual buyer" of eight of Swift's Hotel

Properties for $89 million, and (3) managed to do so by, among other things, representing that

they had an Exclusive Listing Agreement with Swift, proposing and entering into a Commission

Sharing Agreement with Plaintiff, claiming that they would pay Plaintiff a "[c]ooperating

[b]rokerage [f]ee" that was equivalent to a "50/50" split of any three percent commission

payment that they received from Swift, allowing Plaintiff to meet and communicate directly with

Swift, obtain "financial documents concerning the Hotel Properties from Swift," and comply with Swift's "requests to obtain non-disclosure agreements from potentially interested buyers in order to receive such financial documents," and "conceal[ing]" facts, including how "Swift secretly removed Plaintiff's name from [a] purchase and sale agreement referencing Plaintiff as [Swift's] broker[.]" (Compl. ¶¶ 7-30 & Ex. 1 at 1; Muldoon Decl. ¶¶ 3-22, addressing sale-related provisions identifying Plaintiff as Swift's broker in paragraphs eighteen, twenty-four, and twenty-seven).

The record at this stage establishes that the CHC Defendants were located in the District of Oregon when they engaged in the complained-of conduct, and that the CHC Defendants subsequently informed Plaintiff that they lacked the "authority to sign anything" unless Swift "reviewed and approved" it beforehand. (Compl. ¶¶ 7, 23; Muldoon Decl. ¶¶ 3-7, 9-12, 14-15, 18-22.) Also noteworthy is Plaintiff's general counsel's declaration that the CHC Defendants "directly and impliedly represented to Plaintiff that the[y] . . . were licensed real estate brokers in each of the states where the hotel properties were located (none of which were in Oregon)[.]" (Muldoon Decl. ¶ 8.) According to Plaintiff's general counsel, Plaintiff "specifically relied upon" this representation when it "agree[d] to act as a co-broker with the [CHC] Defendants [in selling the hotel properties" and "would not have entered into the Commission Sharing Agreement" or "engaged in any activity with respect to acting as a co-broker with the [CHC] Defendants for the sale of the hotel properties, unless [it] had understood and believed that the [CHC] Defendants were licensed real estate brokers in each of the states where the hotel properties were located." (*Id.*)

This record clearly supports the finding that Plaintiff's evidence and principal legal theory connect each of Plaintiff's tort and contract claims to the District of Oregon. *Cf. In re*

*Bozic*, 888 F.3d 1048, 1053-54 (9th Cir. 2018) (rejecting the defendants' argument that venue was proper under Section 1391(b)(2) and emphasizing that the defendants offered no "evidence or legal theory connecting" the plaintiff's claims to the transferee district).[8] In fact, although Plaintiff sues Defendants in tort and contract, Plaintiff's evidence and theories suggest that all of its claims arise from actions that the CHC Defendants took, and facts they concealed, while residing in this district and acting with Swift's knowledge and approval and in furtherance of their Exclusive Listing Agreement with Swift and/or efforts to sell Swift's Hotel Properties. *Cf.* 28 U.S.C. § 1391(b)(2) (making venue proper in a "district in which a substantial part of the events or omissions giving rise to the claim occurred").

Swift nevertheless moves to dismiss under Rule 12(b)(3) for improper venue, arguing that Section 1391(b)(2) fails to provide a basis for venue in the District of Oregon. (Swift's Mot. at 6-8; Swift's Reply at 2-5.) In so moving, Swift essentially relies on a single intradistrict decision. (*See* Swift's Mot. at 6-8, revealing that this case is only legal authority that Swift cites in addressing Section 1391(b)(2); Swift's Reply at 2-5, citing the same decision and general legal standards and otherwise arguing that Plaintiff cites cases in its opposition that are distinguishable and do not control).

///

---

[8] In *Bozic,* the Ninth Circuit held that the "extraordinary remedy of mandamus" was "unwarranted" but it also found and "agree[d] that the district court "clearly erred" in granting the defendants' motion to transfer the plaintiff's putative class action to a different California district. 888 F.3d at 1049-54. The Ninth Circuit rejected the defendants' arguments that putative class members' actions in the transferee district comprised "a substantial part of the events or omissions giving rise" to the named plaintiff's claims and supported that venue was proper in the transferee district under Section 1391(b)(2), and in doing so, explained that "whether venue [was] proper under [Section] 1391(b)(2) . . . depend[ed] only on the events surrounding [the named plaintiff's] claims," and the defendants failed to "offer[] any evidence or legal theory connecting [the plaintiff's] individual claims" to the transferee district. *Id.* at 1053-54.

The intradistrict decision upon which Swift relies concerned whether venue was proper in a diversity action for fraud and breach of a contract to sell "real estate in Florida." *Coast Equities v. Right Buy Props., LLC*, No. 3:14-cv-01076-ST, 2015 WL 13333017, at *1, *8-9 (D. Or. Feb. 18, 2015), *findings and recommendation adopted*, 2015 WL 1477901, at *1-4 (D. Or. Mar. 31, 2015), *aff'd on other grounds*, 701 F. App'x 611, 612-13 (9th Cir. 2017). The district court found that venue was proper "only if 'a substantial part of the events or omissions giving rise to the claim occurred' [in Oregon]." 2015 WL 13333017, at *9 (quoting 28 U.S.C. § 1391(b)(2)). The district court then held that the plaintiff failed to establish that venue was proper under Section 1391(b)(2):

> . . . At best, [the plaintiff, a Nevada limited liability company with one member from Oregon,] has established that a series of telephone and email communications concerning [its] purchase of the [p]roperties . . . took place between its manager, [an Oregon resident], and [an individually named defendant] owner [of a privately held Michigan limited liability company, whose owners were citizens of the United Kingdom and residents of either the United Kingdom or the Republic of South Africa], between late March and late April 2014[, i.e., about four months before the plaintiff filed the lawsuit]. Ultimately, however, the parties parted ways without closing the real estate transaction that first brought them together. Even assuming that [the manager] was in Oregon when those communications took place does not establish that a substantial part of the events forming the bases of this case took place in Oregon. The events and omissions that form the basis of [the plaintiff's] claims are alleged failures to close the [agreement] due to title defects, maintenance issues, and misrepresentations concerning certain liens, all concerning Florida real estate. This case involves no Oregon real estate, no Oregon title defects, no Oregon property maintenance issues, and no Oregon liens. Any alleged misrepresentations relate fundamentally to the [agreement], a contract involving issues concerning the transferability, habitability, and lack of clear title or other defects existing on [p]roperties in Florida. [Thus,] no events or activities took place in Oregon. Accordingly, this court concludes that venue is improper in this district.

> [The defendant and its individually named owner] suggest that venue "more likely lies in Florida," without expressly requesting transfer of this case there. Because there appear to be no impediments to refiling this case in Michigan or Florida, and because [the plaintiff] has failed to show that venue is proper here, this case should be dismissed based on improper venue.

*Id.*; *see also id.* at *1, *3-5 (addressing the timing and the residence and citizenship of relevant actors).

Swift attempts to draw parallels between this case and *Coast Equities* by highlighting the *Coast Equities* defendants' limited connection to Oregon (i.e., a "series of telephone and email communications") and the district court's emphasis on the absence of any Oregon (as opposed to Florida) "real estate," "title defects," "property maintenance issues," and "liens," and how "[a]ny alleged misrepresentation" was "relate[d] fundamentally" to a contract to sell Florida real estate. (Swift's Mot. at 7 & Swift's Reply at 3-4, quoting *Coast Equities*, 2015 WL 13333017, at *9.) Swift also argues that like the situation presented in *Coast Equities*, the "events and omissions that form the basis of Plaintiff's claims have nothing to do with Oregon" because the "purported contract would have been performed upon the closing of the properties in Alaska," the parties' contractual obligations "would have been targeted at or located in Alaska," and Plaintiff is based out of California, which is "where the alleged harm would be felt." (Swift's Mot. at 7; Swift's Reply at 4.)

The Court finds *Clear Equities* distinguishable. *Coast Equities* involved no Oregon defendants, let alone ones that resided at all relevant times in the District of Oregon, including when they purportedly acted with a co-defendant's knowledge and approval in soliciting a nonresident plaintiff's assistance in finding a buyer for the co-defendant's hotel properties, proposing, signing, and transmitting an agreement to pay the plaintiff a "[c]ooperating [b]rokerage [f]ee" equivalent to a split of the three percent commission that they expected to receive from the co-defendant, and misrepresenting, failing to disclose, and/or concealing

relevant facts.[9] Nor did *Coast Equities* involve a payment conditioned on the plaintiff's success generating a lead and buyer of the co-defendant's hotel properties and thus caused the plaintiff to spend at least fourteen months and expend "substantial time and effort" working and "canvas[sing] [its] many contacts and connections" in the "hotel industry throughout the United States," and communicating with the Oregon defendants and their co-defendant. (Compl. ¶¶ 10, 13 & Ex. 1 at 1.)

Swift fails adequately to address whether Defendants' activities in Oregon "giv[e] rise to" Plaintiff's tort and contract claims. The Eighth Circuit addressed a similar situation in *Steen v. Murray*, 770 F.3d 698, 700-04 (8th Cir. 2014), *cert. denied*, 575 U.S. 997 (2015).

The appeal in *Steen* concerned Iowa plaintiffs' sale of part of their farmland and a Nebraska law firm and lawyers' alleged breach of a "contract for legal services" and "unethical failure to disclose" a conflict of interest. 770 F.3d at 700, 704. The Eighth Circuit rejected the Iowa plaintiffs' argument that the district court erred in finding that venue was improper in the Southern District of Iowa under Section 1391(b)(2). *Id.* at 704. The Eighth Circuit acknowledged that the plaintiffs' farmland was located in Iowa and that the Nebraska defendants "could not have committed malpractice" without agreeing to "represent Iowa clients in matters controlled by Iowa law, while failing to disclose [an] unethical dual representation." *Id.* The Eighth Circuit, however, held that these events did not "give rise to" the plaintiffs' claims that the defendants breached a "contract for legal services" and "unethical[ly] fail[ed] to disclose" a conflict of

---

[9] Plaintiff attaches as Exhibit 1 to its complaint the Commission Sharing Agreement that the CHC Defendants proposed and signed and included the above-described terms. (Compl. ¶ 12 & Ex. 1 at 1.) By way of comparison, Swift declares under penalty of perjury that he had "no prior knowledge of the purported Commission Sharing Agreement between [the CHC Defendants] and [Plaintiff]," and that he "never agreed, nor would . . . have agreed, to pay a three percent . . . commission on the sale of the relevant Alaska properties." (Swift Reply Decl. ¶¶ 3-4.)

interest. *Id.* at 700, 704. In so holding, the Eighth Circuit emphasized, among other things, that the plaintiffs' case was "not a property dispute" and the defendants were in Nebraska when they "alleged[ly] fail[ed] to disclose a conflict of interest" and "draft[ed] option and purchase agreements that improperly favored [their conflict of interest], either negligently or by design." *Id.* at 704.

Similarly here, the record reflects that the CHC Defendants were in Oregon and acting with Swift's knowledge and approval when they solicited Plaintiff's assistance, failed to disclose relevant facts, entered into an agreement with Plaintiff related to Defendants' efforts to find a buyer for Swift's Hotel Properties, and communicated with Plaintiff and Swift for more than fourteen months. On this record, Plaintiff has met its burden of establishing that a "substantial part of the events or omissions giving rise" to its claims occurred in the District of Oregon and that "venue []herein is proper." *Cox*, 2026 WL 378500, at *11 (making a similar finding in a different situation).

"Notably, [S]ection 1391(b)(2) does not require that a majority of the events have occurred in [this] district . . . , nor does it require that the events in [this] district predominate[.]" *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1039 (N.D. Cal. 2020) (quoting *Ward v. Certain Underwriters at Lloyd's of London*, No. 18-cv-07551, 2019 WL 2076991, at *5 (N.D. Cal. May 10, 2019)). Rather, it is well established that "venue may be proper in multiple districts if a 'substantial part' of the underlying events took place in each of those districts." *Id.* (quoting *Ward*, 2019 WL 2076991, at *5); Charles Alan Wright et al., *supra* note 7, § 3806 ("It has always been clear that there can be more than one district in which a substantial part of the events giving rise to the claim occurred. Thus, Section 1391(b)(2) may be the basis for venue in multiple districts.") (simplified).

For these reasons, the Court denies Swift's motion to dismiss under Rule 12(b)(3) for improper venue.[10]

## II.    FAILURE TO STATE A CLAIM

Defendants move under Rule 12(b)(6) to dismiss Plaintiff's claims, with prejudice and without leave to amend, for failure to state a claim.[11] (CHC Defs.' Mem. Supp. at 1, 4, 12; Swift's Mot. at 9, 16.) Defendants argue that Plaintiff seeks compensation that Defendants allegedly owe to Plaintiff because of the sale of Swift's Hotel Properties, Plaintiff failed to comply with Oregon's Real Estate License Law, and thus Plaintiff's action to collect any compensation is barred as a matter of law. (CHC Defs.' Mem. Supp. at 1, 4, 12; Swift's Mot. at 9, 16.)

///

_____

[10] During oral argument, the CHC Defendants represented that they agreed with Swift's position that venue was improper. (*See generally* CHC Defs.' Mot. at 1, basing the CHC Defendants' Rule 12(b)(6) motion in part on the "record of this Court" and "such other oral and/or documentary evidence as may be presented to the Court"). Before oral argument, the CHC Defendants filed a reply in which they accepted as true, and described as a "clear admission" and claim- and case-dispositive "conce[ssion]," Plaintiff's allegation that "[a] 'substantial part of the events and/or omissions giving rise to the claims herein occurred within' Oregon" and the "District of Oregon." (Defs. CHC & Cordell's Reply Supp. Mot. Dismiss ("CHC Defs.' Reply") at 1-6, 8, ECF No. 18, quoting and citing Compl. ¶ 2; Swift's Mot. at 14 & Swift's Reply at 5-6, quoting and relying on the same allegation; *see also* CHC Defs.' Mem. Supp. at 1, 4-12, arguing that Plaintiff fails to allege compliance with Oregon or Alaska real estate licensing requirements but relying on Oregon law and including only one footnote citation to an Alaska statute; CHC Defs.' Reply at 9-10, addressing futility and presenting a one-sentence argument on Alaska law). In their reply, the CHC Defendants also invoked Swift's motion to dismiss for improper venue but did so in passing and while expressing their view that Plaintiff "cannot have its cake and eat it too," so "*if* a substantial part of the events giving rise to [its] claims did not occur in Oregon, there is no basis for venue in this [d]istrict." (CHC Defs.' at 3 n.4, citing ECF No. 16) (emphasis added).

[11] In addition to presenting his "alternative" motion to dismiss Plaintiff's complaint under Rule 12(b)(6), Swift also "joins and incorporates by reference" the CHC Defendants' motion to dismiss under Rule 12(b)(6) and request for judicial notice. (Swift's Reply at 2; *see also* Swift's Mot. at 2, 16.)

A.      **Applicable Law**

Oregon's Real Estate License Law is codified at "ORS 696.010 to 696.495, 696.600 to

696.785, 696.800 to 696.870, 696.990 and 696.995[.]" OR. REV. STAT. § 696.015(2) (short title).

The Oregon legislature, having deemed the "activity of persons seeking to assist others, for

compensation, to deal in real estate in this state to be a matter of public concern," enacted these

provisions to "assist in creating for the public a healthy real estate market atmosphere and to

assure that professional real estate activity is conducted with high fiduciary standards."

*Id.* § 696.015(1).

Pursuant to ORS § 696.020(2), "[a]n individual may not engage in, carry on, advertise or

purport to engage in or carry on professional real estate activity, or act in the capacity of a real

estate licensee, within this state unless the individual holds an active license as provided for in

this chapter." *Id.* § 696.020(2). ORS § 696.020(3) identifies other statutory requirements to

which real estate brokers are subject and bound while engaging in "professional real estate

activity":

> Real estate brokers, managing principal brokers and principal real estate brokers
> are bound by and subject to the requirements of ORS 696.010 to 696.495,
> 696.600 to 696.785, 696.800 to 696.870, 696.990 and 696.995 while:
>
> (a)      Engaging in professional real estate activity; or
>
> (b)      Acting on the licensee's own behalf in the sale, exchange,
>          lease option or purchase of real estate or in the offer or
>          negotiations for the sale, exchange, lease option or
>          purchase of real estate.

*Id.* § 696.020(3)(a)-(b).

As relevant here, ORS § 696.020(3) reflects that real estate brokers engaging in

"professional estate activity" must satisfy ORS § 696.710's requirements. *Id.* ORS § 696.710

bars unlicensed real estate brokers' actions to collect "compensation" for "professional real estate

activity" and requires all real estate brokers to plead and prove that they were licensed when their

claim arose:

> (1)    A real estate broker or principal real estate broker conducting professional
> real estate activity within this state may not bring or maintain any action
> for the collection of compensation without alleging and proving that the
> individual was a real estate licensee when the alleged cause of action
> arose.
>
> (2)    An action for collection of compensation from a client for professional
> real estate activity conducted by a real estate licensee associated with a
> managing principal broker may not be brought or maintained except by
> the managing principal broker with whom the real estate licensee was
> associated when the alleged cause of action arose.

*Id.* § 696.710(1)-(2); *see also Mayfly Grp., Inc. v Ruiz*, 250 P.3d 360, 363 (Or. Ct. App. 2011)

(recognizing that "an unlicensed real estate broker 'may not bring or maintain any action in the

courts for the collection of compensation'" (quoting OR. REV. STAT. § 696.710(1))); *Scanlon v.

Jensen*, 796 P.2d 371, 372 (Or. 1990) ("ORS 696.710(1) denies unlicensed brokers access to the

courts."); *Ferris v. Meeker Fertilizer Co.*, 482 P.2d 523, 527 n.1 (Or. 1971) (noting that "ORS

696.710 provides a real estate broker cannot maintain a cause of action without alleging and

proving that such person was a duly licensed real estate broker at the time the alleged cause of

action arose").

ORS § 696.010 defines terms that the legislature used in ORS § 696.710 and related

provisions:

> (6)    "Compensation" means valuable consideration for services rendered or to
> be rendered, whether contingent or otherwise.
>
> . . . .
>
> (15)    "Managing principal broker" means an individual who is a principal real
> estate broker and who has registered or assumed responsibility for a
> business name under this chapter.
>
> . . . .

(17)　"Principal real estate broker" means an individual who holds an active license as a principal real estate broker issued under ORS 696.022.

(18)　"Professional real estate activity" means any of the following actions, when engaged in for another and for compensation or with the intention or in the expectation or upon the promise of receiving or collecting compensation, by any person who:

　　(c)　Negotiates, offers, attempts or agrees to negotiate the sale, exchange, purchase, rental or leasing of real estate;

　　. . . .

　　(j)　Assists or directs in the procuring of prospects, calculated to result in the sale, exchange, leasing or rental of real estate;

　　(k)　Assists or directs in the negotiation or closing of any transaction calculated or intended to result in the sale, exchange, leasing or rental of real estate;

　　. . . .

　　(n)　Performs real estate marketing activity as described in ORS 696.600.

　　. . . .

(20)　"Real estate" includes leaseholds and licenses to use including . . . timeshare estates and timeshare licenses . . . , as well as any and every interest or estate in real property, . . . whether the real property is situated in this state or elsewhere.

(21)　"Real estate broker" means an individual who holds an active license as a real estate broker issued under ORS 696.022.

OR. REV. STAT. § 696.010(6), (18), (20)-(21); *see also* OR. REV. STAT. § 696.600(2) (providing that as used in ORS § 696.010(18)(n), "'[r]eal estate marketing activity' means procuring or offering to procure prospects to purchase, sell, lease or rent real estate by telemarketing, mail or otherwise").

　　In addition to the statutory requirements and definitions described above, Oregon's Real Estate License Law includes a section titled "Commission sharing and finder's fees." *Id.*

§ 696.290. Certain individuals are excepted from this section's bar on commission sharing and finder's fees:

> (a)     Except as provided in this subsection, a real estate licensee may not offer, promise, allow, give, pay or rebate, directly or indirectly, any part or share of the licensee's compensation arising or accruing from any real estate transaction or pay a finder's fee to any person who is not a real estate licensee licensed under ORS 696.022, including a nonlicensed individual described in ORS 696.030.
>
> (b)     A managing principal broker may pay a finder's fee or a share of the real estate licensee's compensation on a cooperative sale when the payment is made to a licensed real estate broker in another state or country, provided that:
>
> > (A)     The state or country in which the nonresident real estate broker is licensed has a law permitting real estate brokers to cooperate with managing principal brokers in this state; and
> >
> > (B)     The nonresident real estate broker does not conduct in this state any acts constituting professional real estate activity and for which compensation is paid. If a country does not license real estate brokers, the payee must be a citizen or resident of the country and represent that the payee is in the business of real estate brokerage in the other country.

*Id.* § 696.290(1)(a)-(b).

Oregon's Real Estate License Law also includes a section identifying certain categories of individuals who are "exempt from [its] license requirements." *Id.* § 696.030. Real estate owners' full-time employees are among the individuals who may be exempt from licensing requirements:

> (a)     A nonlicensed individual who is a full-time employee of an owner of real estate and whose real estate activity:
>
> > (A)     Involves only the real estate of the employer; and
> >
> > (B)     (i) Is incidental to the employee's normal, nonreal estate activities; or
> >
> > (ii) Is the employee's principal activity, but the employer's principal activity or business is not the sale, exchange, lease option or acquisition of real estate.

PAGE 26 – OPINION AND ORDER

(b)     For the purpose of this subsection, "owner of real estate" means:

      (A)     A person who has a sole ownership interest in the real estate; or

      (B)     More than one person, each of whom has an ownership interest in the real estate, if the ownership interest is by survivorship, tenancy in common or tenancy by the entirety.

*Id.* § 696.030(1)(a)-(b).

### B.     Analysis

Defendants argue that the Court should dismiss all of Plaintiff's claims with prejudice pursuant to Rule 12(b)(6). (CHC Defs.' Mem. Supp. at 1, 4, 12; Swift's Mot. at 9, 16.) The Court disagrees.

Relying on Oregon's Real Estate License Law, Defendants argue that all of Plaintiff's claims fail as a matter of law and cannot be cured. (CHC Defs.' Mem. Supp at 4, 12; CHC Defs.' Reply at 1, 8-10; Swift's Mot. at 9, 15-16; Swift's Reply 2, 5, 7-8.) Defendants' argument is threefold:

(1)     Plaintiff seeks to recover "compensation" for "professional real estate activity" within the meaning of ORS § 696.010(6) and (18)(c), (j), (k), and (n). "'Compensation' means valuable consideration for services rendered or to be rendered, whether contingent or otherwise." OR. REV. STAT. § 696.010(6). "Professional real estate activity," on the other hand, "means . . . actions . . . engaged in for another and for compensation or with the intention or in the expectation or upon the promise of receiving or collecting compensation, [such as] . . . [n]egotiat[ing], offer[ing], attempt[ing] or agree[ing] to negotiate the sale, exchange, purchase, rental or leasing of real estate; . . . [a]ssist[ing] or direct[ing] in the procuring of

prospects, calculated to result in the sale, exchange, leasing or rental of real estate; [a]ssist[ing] or direct[ing] in the negotiation or closing of any transaction calculated or intended to result in the sale, exchange, leasing or rental of real estate; [and] . . . [p]erform[ing] real estate marketing activity as described in ORS 696.600." *Id.* § 696.010(18)(c), (j)-(k), (n); *see also* *id.* § 696.600(2) ("'Real estate marketing activity' means procuring or offering to procure prospects to purchase, sell, lease or rent real estate by telemarketing, mail or otherwise."). "One act or transaction of professional real estate activity is sufficient to constitute engaging in [such] . . . activity, within the meaning of [ORS] chapter [696]." *Id.* § 696.040.

(2)    Plaintiff engaged in at least one act or transaction of "professional real estate activity" "within this state" and without first obtaining an "active license as provided for in [ORS] chapter [659]," and therefore Plaintiff failed to comply with ORS § 696.020(2)'s licensing requirement. *See* *id.* § 696.020(2) ("An individual may not engage in, carry on, advertise or purport to engage in or carry on professional real estate activity, or act in the capacity of a real estate licensee, within this state unless the individual holds an active license as provided for in this chapter."); *see also* *id.* § 696.010(15), (17), (21) (noting that to qualify as a "[m]anaging principal broker" or "[p]rincipal real estate broker," an "individual" must "hold[] an active license as a principal real estate broker issued under ORS 696.022," and to qualify as a "[r]eal estate broker," an "individual" must

"hold[] an active license as a real estate broker issued under ORS 696.022"); *id.* § 696.022 (detailing Oregon's "[l]icensing system").

(3)    Given Plaintiff's failure to comply with ORS § 696.020(2)'s licensing requirement, ORS § 696.710(1) bars Plaintiff's claims (and denies Plaintiff access to the courts) because Plaintiff fails and lacks the ability to "alleg[e] and prov[e]" that it was an Oregon "real estate licensee when [its] alleged cause[s] of action arose," and because Plaintiff is not excepted from ORS § 696.020(2)'s licensing requirement. *See id.* § 696.710(1) ("A real estate broker . . . conducting professional real estate activity within this state may not bring or maintain any action for the collection of compensation without alleging and proving that the individual was a real estate licensee when the alleged cause of action arose."); *Scanlon*, 796 P.2d at 372 ("ORS 696.710(1) denies unlicensed brokers access to the courts."); *Mayfly Grp., Inc.*, 250 P.3d at 363 (observing that pursuant to ORS § 696.710(1), "an unlicensed real estate broker 'may not bring or maintain any action in the courts for the collection of compensation'"); *Berrey v. Real Est. Agency*, 457 P.3d 306, 308 (Or. Ct. App. 2019) ("Under ORS 696.020(2), a person may not engage in or carry on professional real estate activity in Oregon unless the individual holds an active license. . . . However, some individuals are exempt from certain ORS chapter 696 provisions, including the ORS 696.020(2) requirement that individuals engaging in professional real estate activity be licensed.") (simplified).

In support of their argument, Defendants ask the Court to take judicial notice under

Federal Rule of Evidence ("FRE") 201(b) of Plaintiff's California articles of incorporation,

statement of information, and license records, and Oregon and Alaska licensing-related "search

results" that Defendants generated when they looked up the names of Plaintiff and Plaintiff's

principal, Ali Jahangiri ("Jahangiri"), on official government websites.[12] (CHC Defs.' RJN at 1-2

& Exs. 1-6; Swift's RJN at 2-3 & Exs. 1-2; *see also* CHC Defs.' Mot. at 1; CHC Defs.' Mem.

Supp. at 1.) Defendants argue that these records are proper subjects of judicial notice, which

confirm that Plaintiff "was not, and has never been, a licensed real estate broker in Oregon" or

Alaska. (CHC Defs.' Mem. Supp. at 8, 12, citing CHC Defs.' RJN ¶¶ 5-6 & Exs. 5-6; Swift's

Mot. at 4, 9, 15, first citing CHC Defs.' RJN ¶¶ 5-6 & Exs. 5-6; and then citing Swift's RJN Exs.

1-2; *see also* CHC Defs.' Reply at 3 & n.4, 7 & Swift's Reply at 2, 5, 7, discussing real estate

licenses).

Additionally, Defendants present argument (but not evidence or materials that a court

may consider at the pleading stage) about whether they were or are licensed real estate brokers in

Oregon and Alaska. For example, after arguing that Plaintiff "does not allege, nor can it allege,

that it holds an Oregon or Alaska real estate license" and "concede[s]" or "waive[s]" whether it

had an Oregon license by failing to raise the issue in its opposition, Defendants argue that "no

---

[12] Under FRE 201(b), a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Courts may take judicial notice of publicly available records on state government websites. *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.3 (9th Cir. 2018) (granting a "motion to take judicial notice of [a] slideshow, meeting minutes, and pamphlet because they [we]re publicly available on the Washington government website, and neither party dispute[d] the authenticity of the website nor the accuracy of the information" (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (FRE 201))).

other party is licensed in Oregon, nor is any such allegation made" in Plaintiff's complaint, "[n]o

party in this case is an Oregon-licensed broker, and none is alleged," Plaintiff "does not and

cannot allege that any of the defendants in this case hold an Oregon real estate license . . . [or] an

Alaska real estate license," "there are no Oregon-licensed brokers [that are] a party to this case,"

and Plaintiff fails to "show how it could prove that there are any Alaska-licensed brokers party to

this case." (CHC Defs.' Reply at 7; Swift's Reply at 2, 5, 7.)

      In response, Plaintiff disputes that it engaged in any "professional real estate activity"

"within this state" or so alleges and argues that Defendants improperly attempt to present their

own version of the facts and competing theories at the pleading stage. (Pl.'s Opp'n Swift's Mot.

at 1, 12-16 & n.22; Pl.'s Opp'n CHC Defs.' Mot. Dismiss ("Pl.'s Opp'n CHC Defs.' Mot.") at 1,

4-7 & n.2, ECF No. 15.) Plaintiff adds that Defendants' motions fail for these reasons alone.

(Pl.'s Opp'n Swift's Mot. at 16; Pl.'s Opp'n CHC Defs.' Mot. at 7.) To the extent that the Court

disagrees, however, Plaintiff argues that it is excepted from Oregon's licensing requirement

pursuant to ORS § 696.290(1)(b), because it is licensed in California and "did not conduct in

[Oregon] any acts constituting professional real estate activity and for which compensation is

paid," and California Business and Professions Code § 10137[13] is a "law [permitting] . . . real

estate broker[s] to cooperate with [managing] principal broker[s] in [Oregon.]"[14] (Pl.'s Opp'n

---

[13] California's statute "closely limits" but "does 'not forbid commission-sharing
agreements between agents or between brokers and agents." *Woods v. Merkelbach*, No. 2:23-cv-
02798, 2024 WL 1624171, at *5 (E.D. Cal. Apr. 15, 2024) (ellipses omitted) (first citing CAL.
BUS. & PROF. CODE § 10137; and then quoting *Sanowicz v. Bacal*, 184 Cal. Rptr. 3d 517, 528
(Cal. Ct. App. 2015))).

[14] Plaintiff also argues that it is excepted from Alaska's licensing requirement under
Alaska Statutes § 08.88.401(e)(1) (Pl.'s Opp'n Swift's Mot. at 1), which similarly provides that
"[a] person licensed under this chapter may not knowingly pay any part of a fee, commission, or
other compensation received by the licensee in buying, selling, exchanging, leasing, auctioning,
or renting real estate to . . . a person who is not licensed under this chapter, except . . . this
section does not prohibit . . . payments by a licensee to a person licensed to perform real estate

Swift's Mot. at 16; Pl.'s Opp'n CHC Defs.' Mot. at 1, 7-8 & n.4, first citing CHC Defs.' RJN

Exs. 3-4; then quoting OR. REV. STAT. § 696.290(1)(b); and then citing CAL. BUS. & PROF. CODE

§ 10137.)

Accepting as true Plaintiff's well-pleaded factual allegations and drawing all reasonable

inference in Plaintiff's favor, as the Court must at this stage, the Court finds that Plaintiff alleges

facts sufficient to suggest that it did not engage in any "professional real estate activity" "within

this state." For this reason and others, the Court denies Defendants' motions to dismiss under

Rule 12(b)(6).

Defendants' motions to dismiss are premised on their assertion that because Plaintiff

failed to comply with Oregon's Real Estate License Law by engaging in "professional real estate

activity" "within this state" and without first obtaining an Oregon real estate license, ORS

§ 696.710(1) denies Plaintiff "access to the courts" and bars Plaintiff's claims to collect any

commission payment from Defendants. *See* OR. REV. STAT. § 696.290(1)(b); *Scanlon*, 796 P.2d

at 372. In so arguing, the CHC Defendants highlight "specific[]" examples that they view as

confirmation that Plaintiff engaged in "professional real estate activity" "within this state." (*See*

CHC Defs.' Mem. Supp. at 5, 7-8, 11, first citing OR. REV. STAT. § 696.010(18)(c), (j)-(k), (n);

and then citing and/or quoting Compl. ¶¶ 14, 16, 21-22, 47-48, 56-57, 59-61, 63, 65, 67, 71-72.)

The CHC Defendants also reference Plaintiff's allegations that it was deprived of its "benefits"

under the parties' contracts and regarding its entitlement to a "commission" for the "sale" of

Swift's Hotel Properties and performance of related "work," and efforts to "market the

---

activities in another jurisdiction if the other person has assisted the licensee in the performance
of an act for which a license is required by this chapter[.]" ALASKA STAT. § 08.88.401(d)(1),
(e)(1).

properties," "procure prospects for the sale," and find a "buyer." (*Id.*; *cf.* Compl. ¶¶ 10-15, 17-19, 22, 24-29, 34, 36, 42, 50, 54, 64, 67-68 & Ex. 1 at 1, setting forth relevant allegations).

In their reply, the CHC Defendants instead focus on, accept as true, and describe as a "clear admission" and claim- and case-dispositive "conce[ssion]," Plaintiff's general venue paragraph, in which it cites Section 1391 and alleges that "a substantial part of the events and/or omissions giving rise to the claims herein occurred within this judicial district." (Compl. ¶ 2; CHC Defs.' Reply at 1-6, 8, quoting and citing paragraph two and replacing "judicial district" with "Oregon" or the "District of Oregon"; Swift's Mot. at 14 & Swift's Reply at 5-6, doing the same).

The Court finds Defendants' arguments unpersuasive at this stage of proceedings and on the current record.[15] There is a "prohibition against resolving factual disputes at the pleading stage" and courts may not "take judicial notice of disputed facts" or "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1003 (9th Cir. 2018) (first citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); then citing *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016); and then citing *Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 942 n.1 (9th Cir. 2008)); *see also Sgro*, 532 F.3d at 942 n.1 ("[The plaintiff] alleges that the [incorporated disability] plan documents do not accurately reflect the plan as implemented as to all but the regulation's requirement that [the defendant] make[s] '[n]o contributions' to the plan. For purposes of the motion to dismiss, we have to assume that [he] is right about this.").

---

[15] The Court's finding does not prevent Defendants from raising this issue at a later stage and on a more developed record.

As discussed, Plaintiff disputes Defendants' assertions that it engaged in, or alleges facts establishing that it engaged in, "professional real estate activity" "*within* this state." *See generally* OR. REV. STAT. § 696.020(2) ("An individual may not engage in . . . professional real estate activity . . . *within* this state unless the individual holds an active license as provided for in this chapter.") (emphasis added). Defendants focus on the meaning of "professional real estate activity" but fail adequately to address the statute's use of "within." Instead, and contrary to the Rule 12(b)(6) standard, Defendants draw inferences in their favor in describing Plaintiff's well-pleaded allegations and arguing that Plaintiff's claims fail as a matter of law and cannot be cured.

The Oregon Supreme Court has addressed the meaning of "within" in different statutes and applying familiar principles of construction. In one of those cases, the Oregon Supreme Court observed that "*Webster's Third New International Dictionary* defines 'within' as '(1) in the inner or interior part of: INSIDE OF . . . (2) in the limits or compass of: not beyond . . . enclosed or confined by[.]" *State v. Clemente-Perez*, 359 P.3d 232, 240 (Or. 2015) (simplified). The Oregon Supreme Court later explained that given "*Webster's* definition," a statute's use of the "term 'within' . . . help[ed] to narrow the limits of the phrase 'place of residence,'" and thus the Oregon "legislature's use of the term 'within' in the phrase 'within a person's place of residence' implie[d] that a person's place of residence [was] some type of structure with a discrete interior." *Id.* at 245.

Five years later, in *Pulito v. Oregon State Board of Nursing*, 468 P.3d 401, 407 (Or. 2020), the Oregon Supreme Court again quoted *Webster's Third* in explaining that a statute's used of the "words 'within the time allowed' suggest[ed] a specific period of time, because the word 'within' means 'on the inside or on the inner side' and is 'used as a function word to indicate enclosure or containment,'" and that "'within' is ordinarily an objectively identifiable

period; conveying what can be readily discerned, such as, to illustrate, whether one is within a dwelling; within the limit of a timed exam; or within the bounds of a playing area on a sporting field."[16] *Id.*

Defendants do not address whether a similar definition of "within" applies under these circumstances. Nor do Defendants identify any allegations that satisfy the oft-cited dictionary's definition of "within." This is significant because nowhere in Plaintiff's complaint does it allege any facts suggesting that it was "on the inside," the "inner or interior part," or "discrete interior" of "this state" in connection with the relevant events. (*See* Compl. ¶¶ 10-15, 17-19, 22, 24-29, 34, 36, 42, 50, 54, 64, 67-68 & Ex. 1 at 1, alleging facts related to Plaintiff's "work," meetings "in person and virtually" with Swift, not the CHC Defendants, JL Properties' Letter of Intent's identification of Plaintiff as the "Seller's [i.e., Swift's] Broker," the $89 million "sale" of Swift's Hotel Properties, and Plaintiff's "canvasing" of its "contacts and connections" throughout the "United States" for "interest in the Hotel Properties" and a "lead" or potential or actual "buyer"; *id.* ¶¶ 13-14, 16-17, 29, alleging facts related to the unspecified manner in which Plaintiff "present[ed]" and "introduc[ed]]" "potentially interested buyers" to Defendants and Plaintiff's

---

[16] "The Oregon Supreme Court 'consults *Webster's Third* more often than any other dictionary[,] . . . [and has] explain[ed] that the dictionary has a 'descriptive' focus on 'ordinary usage' in contrast with other dictionaries with a 'prescriptive' focus on 'correct' usage[.]" *E.J.T. ex rel. InTRUSTment Nw., Inc. v. Jefferson County*, No. 24-1717, 2025 WL 2986113, at *4 n.2 (9th Cir. Oct. 23, 2025) (quoting *Kohring v. Ballard*, 325 P.3d 717, 721 n.2 (Or. 2014)); *see also TruNorth Warranty Plans of N. Am., LLC v. Dep't of Consumer & Bus. Servs.*, 536 P.3d 24, 27 n.2, 28 n.4 (Or. Ct. App. 2023) (noting that the Oregon Court of Appeals has "previously stated [that] '[n]otwithstanding its 2002 copyright date, . . . *Webster's Third New Int'l Dictionary* (unabridged ed[ition] 2002) can be considered to be a contemporaneous source for statutes dating back to 1961 (if not earlier),'" and that Oregon courts "'consult dictionaries in use at the time of the legislature's enactment' when [they] interpret the words of a statute" (first quoting *State v. James*, 338 P.3d 782, 786 n.3 (Or. 2014); and then quoting *Clemente-Perez*, 359 P.3d at 244)). Both *Clemente-Perez* and *Pulito* quote the unabridged 2002 edition of *Webster's Third*. *See Clemente-Perez*, 359 P.3d at 240 (listing the dictionary edition); *Pulito*, 468 P.3d at 406-07 (same).

"extensive[]" "communicati[ons]" with the CHC Defendants, "prepar[ation] [of] marketing materials for the Hotel Properties," "acting as [Swift's] broker to market the Hotel Properties," "substantial time and efforts . . . market[ing]" and "relating to the marketing of the Hotel Properties" on Defendants' behalf, and "known and approved substantial efforts to market the Hotel Properties for the benefit of Swift and [the CHC Defendants] in the fulfillment of the[ir] Exclusive Listing Agreement" with Swift).

Additionally, Defendants fail to demonstrate that Plaintiff is unable as a matter of law to establish that it is excepted from Oregon's (or Alaska's) licensing requirements. The record provides no basis from which the Court could make any conclusive determination on these matters or with respect to the location of Swift's remaining four properties and to whom Swift may have sold those properties. Simply put, Defendants present the Court with nothing more than arguments, and also fail adequately to address the Court's inability to draw inferences in Defendants' favor and the long recognized prohibition against resolving fact disputes at the pleading stage.

For all of these reasons, the Court denies Defendants' motions to dismiss under Rule 12(b)(6).

## CONCLUSION

For the reasons stated, the Court DENIES CHC and Cordell's motion to dismiss under Rule 12(b)(6) (ECF No. 7) and DENIES Swift's motion to dismiss under Rules 12(b)(3) and 12(b)(6) (ECF No. 16).

**IT IS SO ORDERED.**

DATED this 19th day of February, 2026.

_Stacie F. Beckerman_

HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 36 – OPINION AND ORDER